Judgment rendered July 16, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,052-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SUCCESSION OF
JOHN GARNER LYNCH

* * * * *

On Rehearing
Originally Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 632,448

Honorable Brady D. O'Callaghan, Judge

* * * * *

| | |
|---|---|
| MIRAMON LAW, INC. | Counsel for Appellants, |
| By: Patricia N. Miramon | Susan Carol Lynch Hunt, |
|     Julia Miramon Todd | Martha Elizabeth Lynch |
|     Connor J. Hargrave | Riley, Nathan Hammett, |
| | and Katie Elizabeth |
| | Smith |
| | |
| CHARLES TAUNTON MELVILLE | Counsel for Appellee, |
| | Succession of John Garner |
| | Lynch |
| | |
| AYRES, SHELTON, WILLIAMS, | Counsel for Appellee, |
| BENSON & PAINE, LLC | Rudy Allen Nolin |
| By: Lee H. Ayres | |
|     Alexandra E. Vozzella | |
| | |
| THOMAS, SOILEAU, JACKSON | Counsel for Appellee, |
| & COLE, LLP | Martha Crosslin |
| By: Erica M. Ducoing | |

* * * * *

Before PITMAN, COX, THOMPSON, HUNTER, and ELLENDER, JJ.

PITMAN, C.J., dissents with written reasons.
ELLENDER, J., dissents with written reasons.

**THOMPSON, J.,**

This matter comes before the Court on rehearing. A well-meaning attorney, faced with a hospitalized client during COVID-19 restricted visits, crafted a plan to replace the effects of the provisions of his client's existing last will and testament to achieve what he concluded the client generally wanted to happen to his estate, which was in part to prevent his children from inheriting his assets. In the last few days of his client's life, the attorney drafted documents to create a trust and used an existing power of attorney to convey all the client's property to that trust, which would remove any assets from being subject to being inherited by his children.

The trust named the client as the initial beneficiary but also contained provisions for a successor beneficiary, someone the client had never made bequests to in his previous last will and testaments. The client never specifically requested or knew anything about the trust and had never indicated he wanted to convey ownership of the entirety of his estate to the person who named himself trustee and successor beneficiary. After the client's death, his adult children challenged the creation of and conveyances to the trust. In response, the individual who benefited from and participated in implementing the plan argued it was in keeping with his understanding of the decedent's stated wishes. In support of that assertion, he relied upon and pointed the court to a recorded conversation between him, the client, and the attorney. The trial court held the actions of the agent and trustee were proper, upheld this use of the power of attorney, creation of the trust, and conveyance of substantially all the property to the trust. The children of the decedent have appealed that judgment.

We find the sweeping provisions of the trust and disposition of the decedent's property to be irreconcilable with limited authority of the power of attorney and recorded expressions of the decedent. We, therefore conclude the actions and conveyances under these circumstances were not for the benefit of the decedent and exceeded the agent's authority, and reverse the trial court and declare that all transfers of the decedent's property to the trust are null and void and remand the matter to the trial court for further proceedings.

**FACTS AND PROCEDURAL HISTORY**

It is pertinent to address at the outset that the actions of the appellees and attorney acting on their behalf appear to have at all times been well-meaning and in good faith. The primary concern is not the motivation of the parties in this matter but, rather, the mechanism to achieve their desired results, which if endorsed by this Court, could create a blueprint undue influence to potentially be asserted by those of lesser moral character, which could victimize both testators, legatees, and heirs. Good faith here, however, is insufficient grounds to allow the actions and results of endorsing the conveyance of all of the decedent's property to a beneficiary (as trustee and successor beneficiary) he never designated, by means of a trust he never requested, and the existence of which he was never advised.

John Garner Lynch ("Lynch") died on August 31, 2021, at the age of 85. At the time of his death, he was a patient at Willis Knighton Medical Center, where he had been since the 18th of August, after being diagnosed with COVID-19. Both Lynch and his fourth wife, Katherine Lynch ("Kathy"), were admitted to Willis Knighton with COVID-19. While hospitalized, Lynch was predeceased by Kathy, by one week. Lynch was

2

survived by two of his children, Susan Carol Lynch Hunt ("Hunt") and Martha Elizabeth Lynch Riley ("Riley"), and predeceased by three other additional children. He was also survived by two grandchildren, Nathan Hammett ("Hammett") and Katie Elizabeth Smith ("Smith"), who are the children of his predeceased son and daughter, John Garner Lynch, Jr. and Lisa K. Lynch Smith, respectively.

Following Lynch's death, Rudy Allen Nolin ("Nolin"), a good friend of Lynch's, filed a petition on September 2, 2021, to probate his last will and testament (the "2018 Testament"), which was dated March 19, 2018, and requested to be appointed independent executor. In the 2018 Testament, Lynch left his entire estate to Kathy (his wife at the time), and did not name any successor or alternate legatees. Lynch nominated Kathy to be independent executrix of the will, and if she could not serve, he nominated Nolin and Martha Crosslin ("Crosslin"), another good friend, as successor executors, in that order. The trial court admitted the will to probate and, as Kathy predeceased Lynch, confirmed Nolin as independent executor. [1]

Subsequently,[2] Hunt, Riley, Hammett, and Smith (hereinafter collectively referred to as the "Heirs") filed a petition for intervention and rule for accounting/discharge, naming Nolin as a defendant. The Heirs' petition asserted that in the 2018 Testament, Lynch had bequeathed his entire estate to his wife, Kathy and that bequest had failed by her predeceasing him. As such, without any alternative legatees named, as his intestate heirs are entitled to be recognized as owners and sent into possession of all Lynch's property and assets.

---

[1] September 6, 2021
[2] October 5, 2021

3

In response, Nolin filed peremptory exceptions of no right of action and no cause of action.[3] In those motions, he stated that on March 19, 2018, the same date Lynch signed the will in question, he also executed a durable power of attorney (the "POA") and appointed Kathy as his agent, Nolin as successor agent, and Crosslin as an additional successor agent. Nolin noted that the POA authorized the agent to form trusts and transfer Lynch's property. Nolin explained that because no one could visit Lynch in the hospital, he could not execute a new will, and the POA was used to transfer all his property to a revocable trust, a plan conceived by Lynch's attorney, John Williams ("Wiliams"), and Nolin. Numerous documents were prepared by Williams to effectuate the plans for Lynch's assets in furtherance of what they described as their understanding of Lynch's desires.

On August 27, 2021, Nolin signed a declination to serve as agent under the 2018 POA, Crosslin accepted the appointment as successor agent at Nolin's request, and she immediately executed documents presented to her by Nolin to create the John Garner Lynch Trust (the "Trust"). Nolin explained that Lynch was named the beneficiary of the Trust for the remainder of his life, and that at his death, the Trust would be for the primary benefit of Nolin and the secondary benefit of other named friends. Lynch died within days of the trust being created and within a few hours of his assets being conveyed to the trust by Crosslin and Nolin. It is difficult to conclude the trust was in any manner in Lynch's best interest or designed for his benefit in the final hours and days of his life. As part of the orchestrated plan, Nolin declined to become Lynch's agent but named

---

[3] November 12, 2021

4

himself in the documents as the trustee of the Trust. Apparently, Nolin, at the direction of Williams, interjected Crosslin as the agent so that it would not appear as though Nolin was acting as agent to convey Lynch's property to himself as trustee and then as beneficiary.[4] In this transaction, Nolin would have functioned as agent to convey the property to the trust, then act as trustee to receive the donation of the assets donated to the trust of which he was the primary beneficiary of the trust and would receive the future benefit. That same day, Crosslin, now acting as agent under the POA, as directed by Williams and Nolin, **transferred Lynch's property to Nolin**, as trustee, by an Act of Assignment and Warranty Deed prepared by Williams.[5] Nolin accepted the transfers between 10:00 and 10:15 a.m. on August 31, 2021, and Lynch passed away at 2:12 p.m. that same day.

Nolin argued that there were clerical errors in the Warranty Deed, including incorrectly naming the trust as the "John Garner Trust," but that these errors were corrected by a Notarial Act of Correction after Lynch's death. The Heirs point out that Lynch died a mere three days after the creation of the Trust and only hours after all his property was transferred into the Trust. The record clearly indicates Lynch never identified Nolin as his universal legatee, never requested his property be placed in a trust, and was never informed by Nolin (trustee), Crosslin (agent), or Williams (attorney) that a trust had been created.

Nolin argued that the Heirs had no right of action to demand an accounting because all Lynch's assets were transferred to the Trust and were

---

[4] We reject this tactic as anything other than a thinly veiled attempt to disguise the appearance of self-dealing by Nolin, when the record clearly indicates he exercised control of Crosslin, and she signed anything he and Williams instructed her to sign without further inquiry.

[5] August 27, 2021.

no longer a part of his estate. He contended that the Heirs have no ownership interest in this property and no right to demand an accounting. He also argued that the Heirs had no cause of action to remove him as independent executor.

In response, the Heirs filed a petition to annul and an amended petition to remove the executor and for accounting,[6] and named Nolin and Crosslin as defendants. They argued that Lynch was not capable of directing the actions of Nolin and Crosslin regarding the POA and the Trust. They contended that the actions of Nolin and Crosslin were not authorized by the POA and could not be used to allow them to self-deal and ultimately transfer all Lynch's assets to Nolin in a trust which has as its primary design to benefit Nolin. They argued that as executor, Nolin acted in his own interest and not in the interest of Lynch or the Heirs to the estate. They requested that Nolin be removed as executor and that Hunt be appointed independent executor, or in the alternative, that the court appoint an independent third-party executor.

Nolin and Crosslin filed exceptions and an answer to the Heirs' petition, and a hearing[7] was held on Nolin and Crosslin's exceptions and the Heirs' petition to remove the executor and for accounting. The trial court filed a judgment, granting Nolin's exception of no right of action related to the Heirs' request for an accounting of the Trust and dismissed their claim with prejudice.[8] It denied Nolin's exception of no cause of action related to the Heirs' request for his removal as executor and granted the Heirs' request

---

[6] August 12, 2022
[7] May 15, 2023
[8] June 15, 2023

6

to remove Nolin as independent executor, denied their request to appoint Hunt as executrix, and named a third-party executor. It granted Crosslin's exception of no cause of action related to the Heirs' request for an accounting of actions taken by her as agent and dismissed the Heirs' claim without prejudice. It denied Crosslin's exception of no right of action related to the Heirs' request to nullify the Trust and referred it to the merits.

The Heirs amended their petition against Crosslin and alleged that she engaged in numerous acts that exceeded her appointment as agent, including that she used the POA to create the Trust, which was not used for the benefit of Decedent's descendants and when Decedent was not interdicted; that she attempted to transfer Decedent's property to the Trust, when the Trust is not for the benefit of Decedent's descendants; and that she attempted to donate Decedent's entire estate to the Trust, in violation of La. C.C. art. 1498.

Crosslin filed an answer and requested judgment in her favor and that the Heirs' claims be dismissed with prejudice. [9] A bench trial followed. [10] The first witness, Creighton Hodges, CPA, testified that Williams, Lynch's attorney, contacted him after Lynch's death to prepare his tax returns for 2018, 2019, 2020, and 2021. He determined that the total amount of federal taxes and penalties due for the years 2018 to 2021 was $122,789, and the total amount for the State was $28,601. Thus, Lynch's estate owed the government $151,390.

During Crosslin's testimony, she confirmed she and Lynch had been friends since the 1980s. She was a nurse at the hospital where Lynch received his final medical care and saw him three times while he was

---

[9] June 29, 2023
[10] October 12, 2023

7

hospitalized. She acknowledged she did not tell Lynch that she accepted the appointment as his agent under the POA and that she never spoke with him about creating a trust for his property. Crosslin testified that she, without inquiry or question, transferred Lynch's property, without his knowledge, to the Trust on documents provided by Nolin and Williams and did so at their direction. She noted that on August 27, 2021, the documents were signed, Lynch was in "very bad shape" in the ICU on high-flow oxygen but that he was not on a ventilator. She testified that Nolin and Williams showed up at her house, stood in her driveway, and told her that she needed to sign the paperwork for the POA and the Trust. She executed those documents in her driveway without examining them and had nothing else to do with the Trust.

On cross-examination, Crosslin identified a 2014 last will and testament ("2014 Testament") for Lynch, in which his third wife at the time, Marlene, who also predeceased him, was named the sole legatee. In the 2014 Testament, Lynch again made no provisions for his children or any other alternative legatees. Crosslin testified that Lynch's relationship with his children was better during his marriage to Marlene but that in 2018, at the age of 82, when Lynch married for the fourth time, to Kathy, his contact with his children deteriorated. Crosslin testified that she also did not spend as much time with Lynch after his latest marriage and stated, "I think his relationship was different with everybody after he married Kathy." When asked why the Trust was necessary for Lynch, when she had full power of attorney to manage anything that might arise while he was in the hospital, Crosslin stated that she created the Trust because Williams recommended it. Crosslin testified:

8

> Q: So you just did what they told you to do [regarding creating the trust]?
>
> A: I did.
>
> Q: Okay. And none of the wills, not the will he had for Marlene …or the will that he had with Kathy had an alternate beneficiary beside his wife, correct?
>
> A: No.
>
> Q: All right. And did you ever say, hey, John, you need to put somebody down as an alternate because you've already outlived two wives?
>
> A: We did…My husband and I both had told him that on, on different times.
>
> Q: And he never did that, right?
>
> A: He never did that.

Crosslin confirmed that neither she nor Nolin was ever named as a beneficiary of any of Lynch's wills, including the 2014 Testament and the 2018 Testament.

During Nolin's testimony, he acknowledged that he was never named as a beneficiary of any of Lynch's wills. Nolin confirmed Lynch was unaware that Nolin was creating the Trust and that Lynch did not direct him to create the Trust or make him the beneficiary of the trust. Despite this, Nolin acknowledged that he was the primary beneficiary of the Trust. Nolin testified:

> Q: So he asked you to take care of his estate. Did he ask you to get his estate, to become the owner of his property?
>
> A: No.
>
> Q: So he never said, hey, Al, I want you to become the owner of everything?
>
> A: No.

9

Nolin testified that Lynch told him he wanted Nolin to "take care of" his property but never stated that he wanted Nolin to become the owner of his property. Nolin testified that while Lynch was in the hospital, people had broken into his property and stolen items from him. Nolin confirmed that he could have taken care of Lynch's property while he was alive without the Trust. It is evident that Lynch relied on Nolin to help administer his property and that Nolin acted in good faith in helping administer the property, to the extent possible, while Lynch was hospitalized. When asked how the Trust, and the authority he created for himself as trustee, as opposed to the authority to act as agent under the 2018 POA, helped him preserve the property that was being stolen and broken into, Nolin testified, "I don't think it did." Nolin acknowledged that he signed deeds transferring property into the Trust on August 31, 2021, the day that Lynch died. He did not know for sure that Lynch was still alive when he signed the documents.

Regarding what apparently prompted Lynch's property to be placed in a trust, Nolin testified that while Lynch was in the hospital, some of his properties were being broken into and his things were being stolen. Those circumstances prompted Nolin to participate in a telephone call with Lynch, while Nolin was in the presence of Williams and Williams's associate. There is no indication Lynch asked for the telephone conversation to be recorded or even knew that it was. Nolin and Williams point the Court to this telephone call as evidence of instructions from Lynch that they implemented through the juggling of the role of agent and creation of the trust to benefit Nolin to the exclusion of Lynch's children, who would have inherited from Lynch through intestacy.

The record reflects that the telephone call was only partially recorded and was played at trial. A somewhat inaccurate transcript was prepared and filed in the record. The entirety of what is purported to be a "transcribed" version of that telephone call is attached as Appendix A to this opinion.

A review of the recording reveals that each person, Lynch included, stated that they expected Lynch to get out of the hospital and return home. The discussions clearly focused on the administration of Lynch's property while he was hospitalized. Lynch stated that he expected to get out of the hospital within the following two days. Nolin and Williams both agreed Lynch was expected to leave the hospital. During the call, Nolin and Williams prompted specific questions to Lynch about certain items and whether he wanted certain people to receive a few specific items. Lynch would respond but did not initiate discussions regarding bequeathing any of his property to anyone. He clearly had plans for it when he would be discharged from the hospital.

The few items discussed during the call comprise only a small portion of Lynch's estate, and there is no mention of any intention to convey or direct to anyone, including Nolin, the majority of Lynch's assets as owner. As the questioning continues during the phone call, it is clear that Lynch did not intend and had not planned on this conversation being a discussion of global estate planning and, rather, just requested that Nolin take care of his things until he left the hospital. When asked by Williams "if there was like a charity ultimately you wanted anything to go to," Lynch, obviously understanding that Nolin and Williams were prematurely making permanent plans for his property, replied, "Don't iron your dress just yet," before the telephone call ended.

11

Appellees argue Lynch intended to prevent his children from inheriting through intestacy, which would occur due to his wife and only legatee in the 2018 Testament predeceasing him. Williams had prepared Lynch's 2014 Testament and his 2018 Testament and discussed that very topic with him on at least two occasions. During his testimony, Williams confirmed that Lynch was aware that if he did not name alternate legatees in his 2014 Testament and 2018 Testament, and if he outlived his wife, then his children and grandchildren would inherit his estate through intestacy.

Williams further testified that it was his idea to use the power of attorney and to create the Trust. Williams asserted he conceived and implemented this plan "to accomplish what John wanted with his estate." Williams confirmed that Lynch never asked for a trust and was never made aware by him or anyone else that a trust had been created and that his property had been conveyed to it. When asked whether he had tried to draft a new will for Lynch after his fourth wife Kathy died, Williams testified that COVID-19 restrictions may have prevented him from visiting with Lynch in person, and that "well, I didn't need to, I had a power of attorney." Regarding the trust document and conveyances, Williams confirmed that Nolin signed the deeds and other trust documents at 10:30 a.m. and that Lynch died at 2:30 p.m. on that same day.

Lynch's daughter Riley testified at trial that she thought she had a good relationship with her father, and they talked on the telephone once or twice a month. She stated that she spoke to Lynch while he was in the hospital and that she also spoke to Nolin. She was aware that Lynch intended to leave everything to Kathy, and she told her father that she would not do anything to disrupt this from happening. She stated that Lynch never

mentioned what would happen if Kathy predeceased him because he was sure she would outlive him. She testified that she did not know anything about the creation of the Trust and that when she asked Nolin about the 2018 Testament, he said there was no will. She also asked Nolin if she could go to her father's house and help with his services, and Nolin would not allow her to do so.

Lynch's grandson, Hammett, testified that his parents never married, so he did not meet his grandfather until he was older and when he was seeking out his father. He stated that he saw his grandfather three times before his death and that they had nice visits. He recalled that during the first visit, Lynch told him that if he was looking for money, he was not going to receive any. Hammett responded that he was not there for money but to meet his father's family. On cross-examination, he agreed that the last time he saw Lynch was in 2018 or 2019.

On December 1, 2023, the trial court filed a judgment, finding that Lynch's desire to disinherit his heirs was clear. It determined that due to Kathy's death and his own final illness, Lynch was unable to execute a testament reflecting his wishes, so he equipped his friends, Nolin and Crosslin, with legal means to achieve his desires regarding his possessions. The trial court used the partially recorded telephone call to justify this assumption that Lynch had expressed his testamentary wishes to Williams and Nolin and that Williams and Nolin were simply carrying out his wishes.

The trial court determined that the POA granted the "broadest possible authority over [Lynch's] affairs" to Kathy, Nolin, and Crosslin, citing the language in the POA that stated:

> To make gifts, grants, or other transfers without consideration, either outright, in trust or otherwise to or for the benefit of Appearer's children and their descendants, the spouses of all of Appearer's descendants, **and such other persons as Agent may determine to be in Appearer's best interest or in the best interest of Appearer's estate**.

(Emphasis original.) It also found that the Trust was validly created. It stated that the parties agreed that Lynch's property in Texas and his IRA were not properly transferred to the Trust, so they would ultimately be distributed to the Heirs under the law of intestacy. The court noted that these assets are more than sufficient to cover any debts of the succession. It determined that all other property, both movable and immovable, was validly transferred to the Trust.

Regarding the error in the name of the Trust in the Warranty Deed, the trial court found that the Notarial Act of Correction was appropriate but unnecessary and that the public records doctrine cannot be extended to thwart Lynch's wishes. Accordingly, the trial court decreed that the Trust was validly created and that the Act of Assignment and Warranty Deed transferred Lynch's assets to the Trust, not including his IRA or property in Texas. It denied the Heirs' petition to annul and dismissed it with prejudice. The Heirs now appeal this judgment.

## ASSIGNMENTS OF ERROR

The Heirs assert the following five assignments of error:

**First Assignment of Error:** The trial court erred when it found that Nolin and Crosslin could use a power of attorney to create a Trust that did not benefit Lynch's children, their descendants or their spouses and was never authorized or even discussed with Lynch and benefitted Nolin.

**Second Assignment of Error:** the trial court erred when it found that a deed attempting to transfer "all my property" was valid.

**Third Assignment of Error:** the trial court erred when it found that a Notarial Act of Correction created after the death of the donor and recoded

14

after the death of the donor could be used to change the name of the Trust/Donee in a donation deed and validly transfer property to that trust to the detriment of the donor's intestate Heirs.

**Fourth Assignment of Error:** the trial court erred when it found that the Louisiana immovable property was validly transferred to the trust.

**Fifth Assignment of Error:** the trial court erred when it found that all moveables were validly transferred to the Trust.

## DISCUSSION

In their first assignment of error, the Heirs contend that the trial court erred in finding that Nolin and Crosslin could use the POA to create the Trust and transfer Lynch's assets to that trust for the benefit of Nolin.

As outlined above, Lynch's friends encouraged him to put something in his will about who would receive his estate if he outlived his wife. Lynch elected not to follow those recommendations, even after speaking with his attorney on the subject in preparing his last will and testaments in 2014 and again in 2018. Lynch had already outlived two wives when he had Williams prepare his 2018 Testament, and he knew his children would inherit if his wife at the time were also to predecease him. Lynch had lived with his 2014 Testament controlling and knowledge his children would inherit for years between the death of his third wife and his marriage years later to his fourth wife. In the 2018 Testament he knowingly continued that apparent intentional plan.

The district court relied, at least in part, on the telephone call between Lynch, Nolin, and Williams to support the argument that Lynch intended to disinherit his children and bequeath all of his property to Nolin. We disagree that the telephone call equates to Lynch expressing that he wanted Nolin to own all his property. The transcript reveals Lynch made no

15

mention of a great many of his assets and never identified Nolin to receive any assets other than one or two guns.  Even Nolin testified that Lynch never made such a request or declaration.

Our review of the recorded telephone conversation makes clear that it was not intended to be an estate planning conference or direction by Lynch for his assets to be conveyed to Nolin.  Lynch's intentions and discussion reflected in the transcript of the telephone call are irreconcilable with the provisions of the trust document and the naming of Nolin as beneficiary of Lynch's assets.  The call was initiated to tell Lynch that his property had been very recently vandalized, items belonging to him had been stolen, and there presently existed a risk of additional thefts and damage.  A review of the telephone conversation illustrates that Nolin prompted Lynch about what he wanted him to do with the property that may not be secured while he was in the hospital.  Nolin testified:

> I had told him that things were not good at his farm, you know. It was being broken into.  **And we needed to do something, so if you got out of the hospital that you would have something left when you got there**, you know. So that's, that's when he told me to take care of things.

(Emphasis added.)  Contrary to any assertion that Lynch named Nolin as his universal legatee, the record reflects that all people involved in the telephone conversation, most especially Lynch himself, expected that he would be soon leaving the hospital.  Importantly, Lynch did respond to questions and name a few people he would like certain items to go to, but when Nolin and Williams inquired about his property and possible charitable donations, Lynch said "**Don't iron your dress just yet.**"  We interpret this colloquialism to mean that Lynch was not prepared and had no present desire to outline plans for inheritance of his assets and that Lynch did not

intend to engage in a conversation effectively concerning global estate planning on this phone call. Additionally, when Lynch does name someone and says, "he gets the farm," that request is rejected by Nolin, who replies: "Okay, well right now we're keeping the farm, how about that?" Nolin continues, "And we'll decide later, now we may have to liquidate some of it to pay the bills, I don't know …" Lynch replies: "I don't think we will …" If the telephone call is to reflect Lynch's donative intent, this request was rejected by Nolin, and as a result, the property went to the trust and would then go to Nolin as beneficiary.

The record simply does not support an interpretation of this telephone conversation as a directive from a dying man to his lawyer and friend to dispose of all his assets for the benefit of Nolin. A fair review of the telephone call and transcript establish Lynch never said anything approaching the results of implementing the trust, conveying his assets to it, or naming the beneficiary. The provisions of the trust are a gross overreach.

We decline the invitation to elevate the limited telephone conversation as a call of action and of equal significance to contemplated and longstanding estate plans. Lynch did not empower Nolin or Crosslin to create a trust, convey his assets to it, or name Nolin as its beneficiary.

Although there is testimony that at different times Lynch mentioned not wanting his children to inherit, including specifically saying he did not want his daughters to inherit on the recorded phone call, he never actually was able to reflect on those expressions and never executed a testament that would provide for alternative legatees in their place. Interestingly, Lynch never undertook any efforts to disinherit his children at any time, if that was in fact, as suggested by Nolin, Lynch's true intention. His actions, and

inactions, over several years and after the death of previous wives, speak volumes about his actual desires. Importantly, as previously referenced, the record indicates that Lynch did not care what happened to his assets if his wife predeceased him, a response necessitated by questions on the topic raised by Williams. Williams testified that Lynch did not believe he would outlive Kathy and did not care where his assets would go if she predeceased him. Regarding the language of Lynch's 2014 Testament and his appreciation of its effect, Williams had the following conversation[11] with Lynch:

> Q: Mr. Williams, at the time that you were asked to prepare this Will that we identified as Exhibit 1A, what -what did you discuss with Mr. Lynch?
>
> A: Who he wanted to leave his estate to. And he told me he wanted to leave it to his wife at the time, which was referred to as Marlene. I asked him at the time, I said, "What if she doesn't survive you?" And I still remember, John was sitting there in overalls, and pointed to his belly and said, look at me. "I don't - I don't think that I'll survive her. **So, I'm not worried about where it goes if she doesn't survive me.**"

(Emphasis added.)

Williams and Nolin decided to use the POA as an estate planning "work around" to overcome Lynch's children from inheriting as intestate heirs. Nolin testified that he could have administered and cared for Lynch's assets while Lynch was alive without the Trust. Williams testified that he never even tried to draft a new will for Lynch to sign. It seems unlikely, based on the telephone conversation and his prior actions, that Lynch would have actually signed a new will with the provisions contained in the trust, as he believed he was leaving the hospital and had already deflected numerous

---

[11] R. P. 824, l. 30 – R. P. 825, l. 8.

18

questions over the years from Williams and Crosslin regarding bequests of his property and his children. Lynch wanted Nolin to "take care of" his property, particularly concerning the break-ins that were happening while he was in the hospital. There can be no confusion that the plain language of "taking care of" or administering something is *not* intended to be the same as becoming the owner of a person's entire estate. If Lynch had desired Nolin be an alternative legatee to Kathy, he certainly could have done so in any one of his notarial testaments or prepared a codicil to that effect. He did neither. Instead, Nolin and Crosslin replaced Lynch's volition with their own by use of the POA and directed Lynch's assets through the trust and to Nolin. Nolin may have given all the assets away in an attempt to satisfy what he believed Lynch wanted, but there was no requirement to do so, and this blueprint empowers those who, unlike Nolin, have motives for personal gain.

The authority of the representative to represent another in legal relations may be conferred by law, by a contract of mandate, or by the unilateral juridical act of procuration. La. C.C. art. 2986. Pursuant to procuration, a person, the principal, confers authority on another person, the representative, to represent the principal in legal matters. La. C.C. art. 2987. The term procuration refers to the same contractual relationship that is known as a power of attorney. *Richland State Bank v. dePingre*, 54,411 (La. App. 2 Cir. 4/5/22), 337 So. 3d 579. A power of attorney is subject to the rules of mandate to the extent those rules are compatible with the nature of the representation. La. C.C. art. 2988.

Under the rules of mandate, the authority to alienate or encumber a thing must be expressly given. La. C.C. art. 2996. Express authorization is

19

required for the agent to contract a loan, acknowledge a debt, or become a surety. La. C.C. art. 2997(3). Self-dealing also requires **express** authority. *Richland*, *supra*. La. C.C. art. 2998 requires that a mandatary who represents the principal as the other contracting party may not contract with himself unless he is authorized by the principal. When the authority to self-deal involves the sale of immovable property, that authority must be specific and in writing. *Noel v. Noel*, 16-734 (La. App. 3 Cir. 8/2/17), 225 So. 3d 1114, *writs denied*, 17-1817 (La. 1/9/18), 231 So. 3d 651 and 17-1830 (La. 1/9/18), 231 So. 3d 654.

While Nolin was never officially a mandatary of Lynch, the timing of his declination to serve and the obedient compliance of Crosslin to sign, without question, the documents handed to her, is unmistakable evidence of collaboration and control. Nolin declined to serve as his close friend's agent seemingly for the sole reason so that he could then benefit from Lynch's estate as the beneficiary of the Trust. His testimony is that he would have administered and conveyed some of Lynch's property as indicated in the recorded telephone call, but Nolin would become owner of all of Lynch's estate and the trust document clearly indicated it was for the future benefit of Nolin above all else, which would include those mentioned in the recorded telephone call.

One is said to act in a fiduciary capacity "when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other." *State v. Hagerty*, 251 La. 477 (La. 1967). The defining characteristic of a fiduciary relationship is the

special relationship of confidence or trust imposed by one in another who undertakes the act primarily for the benefit of the principal in a particular endeavor. *Scheffler v. Adams & Reese, LLP*, 06-1774 (La. 2/22/07), 950 So. 2d 641. The mandatary is bound to fulfill with prudence and diligence the mandate he has accepted. He is responsible to the principal for the loss that the principal sustains as a result of the mandatary's failure to perform. La. C.C. art. 3001. In order to prove a breach of fiduciary duty, the claimant must show that the party acted fraudulently, breached the trust bestowed upon him, or took actions that exceeded those granted to him. Here, Crosslin did not act fraudulently and her actions were not for her personal gain, but she exceeded the authority granted to her and assisted and collaborated with Nolin in his obtaining almost immediate ownership of Lynch's estate when there was no indication that is what Lynch actually desired or requested.

These actions could be described as self-dealing. Crosslin, as Lynch's agent, had a fiduciary duty, which she promptly abandoned by immediately signing documents presented to her by Nolin and Williams without further inquiry. Crosslin never inquired about the conveyance of all of Lynch's property to a trust that would benefit Nolin and had no knowledge or indication this was Lynch's expressed desire. She never discussed any of these plans with Lynch, and that breach is fatal to her attempts to convey Lynch's assets to the trust. Accordingly, we find that Crosslin breached her fiduciary duty to Lynch as his agent.

A mandatary is not allowed to speculate for his own profit in handling his principal's affairs. *Noe v. Roussell*, 310 So. 2d 806 (La. 1975); *Woodward v. Steed*, 28,676 (La. App. 2 Cir. 9/25/96), 680 So. 2d 1320, *writ*

21

*not considered*, 96-2648 (La. 12/6/96), 684 So. 2d 411. The mandatary must disclose to his principal all facts relating to his principal's affairs. *Id.* As noted above, we believe Nolin declined to serve as the agent to specifically avoid the appearance of self-dealing. Thus, Crosslin accepted her appointment as Lynch's agent. However, Williams also prepared a trust document, acts of assignment to the trust, and a warranty deed to the trust for Crosslin's signature as agent. The trust document packet was presented to Crosslin for her signature while in her driveway. Crosslin had not participated in the telephone conversation with Lynch the evening before, and she did not initiate the concept of the trust or any other action on behalf of Lynch exercising her new authority. Crosslin testified that after signing the documents that morning, her involvement effectively ended.

Crosslin had a duty to confirm with Lynch that he desired, as the Trust documents provided, that Nolin was allowed, after Lynch's death, to transfer all of Lynch's assets to himself:

> so much or all of the trust estate, both principal and income, as in the Trustee's (his own) sole discretion is necessary or beneficial for the support, maintenance, health or education of Al. After Grantor's death, **Grantor's primary concern is for the future benefit of Rudy Allen Nolin**, and secondary concern is for the benefit of Arlin Mullen and Irma McDuff.

(Emphasis added.) Nolin and Crosslin worked in conjunction, when her loyalty was owed to Lynch and what was in his best interest. As Lynch's agent, Crosslin's actions must comport with the authority granted her in the power of attorney, and she must do "**whatever may appear to Agent to be conducive to the interest of [John Garner Lynch]**." The POA granted her the authority to manage the affairs of Lynch, which would remain in effect if, in her words, "something happened to him," such as a stroke, a coma, or

22

incapacity.  However, the Trust was used in this matter solely to rewrite how Lynch's estate would devolve after his death.  The record reflects that Lynch had politely ignored her previous recommendations to him to name an alternate legatee in his will to effectively disinherit his children.  The actions taken by Williams, Nolin, and Crosslin clearly replace Lynch's volition with their own.

Only Nolin and Williams decided on the language of the trust document, which included: "*Grantor's primary concern is for the future benefit of Rudy Allen Nolin . . .*"  There is nothing in the transcript of the phone call with Lynch that suggests that was Lynch's desire.  It may have been Nolin's concern, but Nolin can only direct Crosslin to undertake actions that are in Lynch's best interest or in the best interest of Lynch's estate.  Nolin may very well have the most honorable of intentions, but the mechanism and process of obtaining ownership of all of Lynch's assets creates a troubling blueprint.

In sum, we find Crosslin acted outside the authority granted to her as agent, and that the documents relating to the Trust, the act of assignment to the Trust, the warranty deed, and any other efforts to deprive Lynch's estate of assets solely for the purpose of circumventing Louisiana's laws of intestacy are declared null and of no effect.  The sweeping provisions of the trust and the control and direction of Lynch's assets thereby are irreconcilable with the requirement use of the power of attorney must be exercised to act in the best interests of Lynch, as Lynch gave no such direction or instruction in his limited comments in the recorded conversation.  This assignment of error has merit, and the trial court's ruling is reversed and vacated, and the matter is remanded for further proceedings

23

for the administration of the succession, including payment of all debts and distribution of assets, not inconsistent with this opinion. Discussion of the remaining assignments of error is pretermitted based on this ruling.

## CONCLUSION

For the foregoing reasons, the trial court's ruling is reversed and vacated. The Trust is null and void and all transfers of property, real and personal, corporeal and incorporeal, of John Garner Lynch are null and void. The assets of John Garner Lynch are the property of the estate of John Garner Lynch and the matter is remanded for further proceedings as may be necessary.

**REVERSED. VACATED. REMANDED.**

# APPENDIX A

<u>AUGUST 26, 2021</u>

<u>TELEPHONE CALL BETWEEN AL NOLIN, JOHN WILLIAMS, AND JOHN LYNCH</u>

Nolin:      Wherever I want the farm to go, okay?

Lynch:      Wherever you want the farm to go.

Nolin:      And you don't have any preference at all, John? Can...

Lynch:      No preference

Nolin:      Well, I'd like, if you have any kind of idea of where you'd want it to go—

Lynch:      _____ don't have the most _____

Nolin:      How about Ms. Irma?

Lynch:

Nolin:      Well, how about... how about Billy Mac? You know, I know you said you wanted him to have the truck and the welding machine.

Lynch:      I would like for Billy Mac... I would like Irma to be taken care of.

Nolin:      Irma to be taken care of.

Lynch:      Yeah

Nolin:      In what way? Just see that she's got a pl—

Lynch:

Nolin:      I understand.

Lynch:      Don't give her a bunch of money.

Nolin:      Don't give her a bunch of money.

Page | 1

FILED IN EVIDENCE
IN SUIT No. 632,440

OCT 12 2023

DEPUTY CLERK OF COURT
CADDO PARISH

N-3
Blumberg No. 5117

Williams:    Well, we can work that out. Anything else for anybody else in particular?

Nolin:    How about Arlin?

Lynch:    Arlin? He can have money. Arlin can have money, he's tight as a drum.

Nolin:    Okay... how about Beth?

Lynch:    No.

Nolin:    And how about Susie?

Lynch:    No!

Nolin:    Okay

Nolin:    Okay John, I'm gonna... I'll do my very best to do your wishes. I... how about your guns?

Lynch:    You!

Nolin:    Okay

Lynch:    Billy Mac

Nolin:    Me and Billy Mac.

Lynch:    Yeah

Nolin:    Okay

Lynch:    Now Drew got some I want Jamie to have.

Nolin:    Do what, John?

Lynch:    I want Jamie to have the colts.

Nolin:    You want who to have the colts?

Page | 2

26

Lynch: Jamie. My stepson.

Nolin: Jamie. Okay, I got that.

Lynch: And that .22 special.

Nolin: Okay and a .22 special for Jamie.

Lynch: yeah

Nolin: And Billy Mac gets that commemorative rifle, right?

Lynch: yeah

Nolin: okay

Lynch: And... and give him the welder.

Nolin: The welder and the truck, right? The Peterbilt.

Lynch: yeah

Nolin: okay

Lynch: And the compressor.

Nolin: And the compressor, okay.

Lynch: _____ he gets the farm.

Nolin: Okay, well right now we're keeping the farm, how about that.

Lynch: Alright, leave it there.

Nolin: Okay. And we'll decide later, now we may have to liquidate some of it to pay the bills. I don't know, but...

Lynch: I don't think we will because _____

Nolin: Okay, okay, well we'll...

Williams: Is there any particular, let's just say, is there any particular charities you'd want any of it to go to?

Lynch: Am I talking to Al Nolin?

Nolin: Yeah, you're talking to me right now John.

Lynch: okay

Nolin: Yeah, I'm here with John Williams and he...

Williams: That was me that just asked that, John Williams, I just asked if there was like any charity ultimately you wanted anything to go to or...

Lynch: Okay, John, I'm sorry to sound like this... I don't know.

Williams: Okay

Lynch: Don't iron your dress just yet.

Nolin: Oh that's not, we're not, we're still praying for you brother.

Williams: Absolutely, we want you to get out of this deal and I want to come out and visit you and look at your guns again.

Lynch: Ah, I see, I'll be out of here in the next two days.

Nolin: I know you will. That's the reason I'm praying and the only reason I'm doing this is because you asked me to do it. You know that.

Lynch: Yep

Nolin: You can't punch in on me because you've done put me in a heck of a mess here trying to straighten all this out so you better stay alive.

Page | 4

28

| Lynch: | I'm doing my best. |
| --- | --- |
| Nolin: | Alright, do it John. |
| Williams: | Keep fighting. |
| Lynch: | Alright, bye bye. |
| Williams: | Alright, bye. |

**PITMAN, C.J., dissents**.

I respectfully dissent from the majority opinion. While the majority finds manifest error by the trial court, I do not agree.

As the majority opinion states, the primary concern in this case is not the motivation of the parties but rather the mechanism to achieve the desired results. That mechanism is Lynch's durable power of attorney (the "POA").

"Power of attorney" is a common law term whose equivalent civilian term is "procuration." La. C.C. art. 2986, Revision Comments (a); *Succession of Conville v. Bank One, Louisiana, N.A.*, 40,506 (La. App. 2 Cir. 1/25/06), 920 So. 2d 397. A procuration is a unilateral juridical act by which a person, the principal, confers authority on another person, the representative, to represent the principal in legal relations. La. C.C. art. 2987. A procuration is subject to the rules governing mandate to the extent that the application of those rules is compatible with the nature of the procuration. La. C.C. art. 2988.

Under the rules of mandate, the principal may confer on the representative general authority to do whatever is appropriate under the circumstances. La. C.C. art. 2994. The authority to alienate, acquire, encumber or lease a thing must be given expressly. La. C.C. art. 2996. La. C.C. art. 2997 sets forth additional instances when the principal must give express authority to the representative. Self-dealing also requires express authorization by the principal. La. C.C. art. 2998; *Matter of Succession of Frazier*, 54,751 (La. App. 2 Cir. 9/21/22), 349 So. 3d 634.

As a procuration or power of attorney is a contract, we interpret its provisions pursuant to the rules of contract interpretation. When a contract can be construed from the four corners of the instrument without looking to

1

extrinsic evidence, the question of contractual interpretation is answered as a matter of law. *Sims v. Mulhearn Funeral Home, Inc.*, 07-0054 (La. 5/22/07), 956 So. 2d 583. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Powers of attorney are construed strictly and no special authority is implied by the general terms of a procuration except ordinary powers of administration. *Matter of Succession of Frazier*, *supra*.

In the POA, Lynch granted his representative the following authority, as is relevant to this appeal:

> [T]o do any and every act and to exercise any and every power that Appearer could do or exercise if present and acting for himself and in his own right, including not only all matters of administration, but also all acts of ownership and the doing of whatever may appear to Agent to be conducive to the interest of Appearer.
> Without in any manner limiting or restricting any of the foregoing, Appearer hereby grants unto Agent, for Appearer and in Appearer's name, place and stead, full power and authority:
> \*\*\*
> 2. To do the following things and perform the following acts with respect to Appearer's interest or a part thereof, or an undivided interest therein, in all kinds of things or property, whether movable or immovable, personal or real, corporeal or incorporeal, tangible or intangible, wheresoever situated, and whether now owned or hereafter acquired:
> \*\*\*
> > f. To exchange, sell, convey, assign or otherwise dispose of the same in any manner, including but without being limited to making dations en paiement and gratuitous, onerous or remunerative donations of the same;
> \*\*\*
> 14. To form or cause to be formed, or join with any other person or persons in forming or causing to be formed, one or more partnerships, limited liability companies, corporations, trusts, and other business entities, in any manner, on any terms and conditions, and for any capitalization, duration or purpose authorized by the laws applicable thereto; to execute, as one of the partners, members, incorporators, trustees, or settlers,

proper organizational documents, including without limitation, articles of incorporation, articles of partnership, articles of organization, and to execute any and all other papers which Agent may deem necessary or desirable to effect such formation or in connection with such formation; and to exchange cash or property of any amount or value belonging to Appearer for any form of general or limited interest, or class or amount of stock or other evidence of ownership or membership in such entity, or for any bonds, notes or other evidences of indebtedness of such entity;

***

17. To make gifts, grants, or other transfers without consideration, either outright, in trust or otherwise to or for the benefit of Appearer's children and their descendants, the spouses of all of Appearer's descendants, and such other persons as Agent may determine to be in Appearer's best interest or in the best interest of Appearer's estate, including but not limited to gifts that will be eligible for the annual gift tax exclusion in Section 2503(b) of the Internal Revenue Code (IRO) as it now appears or may be hereafter amended, and gifts of tuition costs and medical costs in accordance with IRC Sections 2503(e) and 2611(b)(1), as they now appear or may be hereafter amended, as well as taxable gifts that may use up Appearer's unified credit during lifetime as the same is defined in IRC Section 2010 as it now appears or may be hereafter amended, as well as gifts to charities and the making or fulfillment of charitable pledges, and to elect split-gift giving in accordance with IRC Section 2513 as it now appears or may be hereafter amended; provided, however, that Agent shall have no power or authority to make a gift to herself, her estate, or her creditors or a gift which directly or indirectly relieves her of a support obligation.

***

21. To sell, transfer and convey all of Appearer's interest in and to any immovable property for such consideration and on such terms and conditions as Agent shall deem proper in her unrestricted discretion; said Agent shall also have full authority and power to execute on Appearer's behalf such contracts to sell, settlement statements, affidavits, declarations and other contracts and documents as in Agent's judgment are proper so as to effectively and completely convey title to immovable property.

As is clearly evident in these sections of the POA, Lynch gave his representative broad and express authority to form a trust and to transfer his assets. The actions taken by Crosslin as agent to create the Trust and transfer property to it were for Lynch's best interest, as he was the

3

beneficiary of the Trust. The majority opinion's focus on whether Lynch designated or desired these actions is irrelevant because the POA expressly provided for them. Lynch knew he had a POA in place, knew the provisions of it and knew who he named as agents—he did not need to be notified of or approve the actions taken by Crosslin as agent after the death of his wife. Lynch could have revoked the POA at any time but did not do so.

There are no allegations in the record that the POA was invalid or that Nolin or Crosslin exercised undue influence to be named as alternate agents when the POA was created. As Nolin and Crosslin testified, Lynch named them as both alternate agents and alternate executors because he trusted them.

The trial court was not manifestly erroneous in determining that Lynch executed a valid POA and that Crosslin was authorized by this POA to create the Trust and transfer assets to it.

For these reasons, I must dissent.

**ELLENDER, J., dissents.**

I respectfully dissent, for the reasons expressed by Chief Judge Pitman, as well as for these additional reasons. The trial court found the transfer of assets to the trust was permissible pursuant to a valid power of attorney, noting the evidence was abundantly clear decedent had no intention of leaving his property to his heirs and the law strongly favors fulfilling the desires of decedent. I agree.

These facts, on first glance, appear suspicious that a power of attorney was used to create a trust to transfer assets just hours before Lynch died from COVID in isolation at the hospital, resulting in his heirs not receiving the bulk of his estate and instead Lynch's best friend, Al Nolin, being designated as the trustee/primary beneficiary of the trust. Further suspicion is created by Nolin declining to act as the agent under the power of attorney, in an apparent attempt to prevent self-dealing. Juxtaposed to these facts is the validity of the broad power of attorney allowing the creation of a trust and transfer of assets to it, and the undisputed conclusion that Lynch did not want his heirs to receive his property, who apparently had little or nothing to do with decedent. Significantly, there is no suspicion of undue influence or bad faith on the part of anyone involved.

Lynch's longtime attorney, John Williams, testified he knew Lynch didn't want his children to receive any of his assets, not based only on the telephone call made a few days before his death, but also based on his prior representation of Lynch. Williams' testimony is unrefuted about what happened and why he took the steps he did, considering his limited options due to Lynch's isolation in the hospital with COVID, choosing to use the authority granted in the power of attorney to effectuate what he believed was

1

Lynch's desire. While it is clear Lynch didn't want his heirs to receive anything, the record is less clear about who he desired to receive his assets. It is worth noting there are no other potential legatees, other than Lynch's heirs, who are claiming they are entitled to his assets and Nolin was apparently Lynch's best friend. It is not unreasonable to believe Lynch might have wanted Nolin to receive his assets following the untimely death of his wife only a week prior to his own death. Regardless, an uncertain determination of who Lynch might would have wanted to receive his assets, other than his wife, doesn't invalidate what occurred here pursuant to a valid power of attorney, particularly on these facts. The power of attorney provides the agent with broad discretion to set up a trust without restriction as to where those assets may ultimately go. The trust as created does not contradict any expressed desires of Lynch. Significantly, it does substantially fulfill his unrefuted desire that his heirs receive nothing.

While I am cognizant of the concern raised by the majority of providing a blueprint for potential undue influence by those of lesser moral character, resulting in the victimization of testators, legatees, and heirs, such a concern should not invalidate actions taken to fulfill the desires of the decedent where there is no suspicion of undue influence or bad faith on the part of anyone involved. Such a determination should be made on a case-by-case basis.

The unique facts of this case provide a reasonable and well-supported justification for why, how, and when the transfer of assets were made pursuant to the clear authority granted in the valid power of attorney. The desires of Lynch were unrefuted that his heirs receive nothing, he took steps after his wife's death, limited by his capacity and circumstances in isolation,

2

to ensure these desires were fulfilled, and he had previously granted a broad power of attorney giving his agent the authority to do what happened here.

For these reasons, and those expressed by Chief Judge Pitman, I respectfully dissent.